UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>-against-<br><br>MICHAEL PROVENZANO,<br><br>Defendant. | : | Case No. 12-CR-612 (NG) |

**SENTENCING MEMORANDUM ON BEHALF OF MICHAEL PROVENZANO**

Matthew E. Fishbein (MF-4264)
*Attorney for Defendant Michael Provenzano*

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Ph: (212) 909-6000

DEBEVOISE & PLIMPTON LLP

919 Third Avenue
New York, NY 10022
Tel 212 909 6000
www.debevoise.com

**Matthew E. Fishbein**
Partner
Tel 212 909 6077
Fax 212 521 7077
mfishbein@debevoise.com

December 11, 2012

Honorable Nina Gershon
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**United States v. Michael Provenzano**
**Criminal Docket No. 12-CR-612 (NG)**

Dear Judge Gershon:

We respectfully submit this letter on behalf of Michael Provenzano, who is scheduled to be sentenced by the Court on December 18, 2012. Mr. Provenzano pleaded guilty on September 21, 2012 to one count of bribery in violation of 18 U.S.C. § 666(a)(1)(B), pursuant to a plea agreement with the United States Attorney's Office (the "Government").

Mr. Provenzano was formerly employed by the New York City Department of Housing Preservation and Development ("HPD") as Director of Construction Services. He was responsible for overseeing inspectors charged with monitoring HPD construction sites. From 2007 to 2009, Mr. Provenzano met with a general contractor who was working on an HPD construction project. In exchange for money, Mr. Provenzano provided the contractor with inspection reports related to the contractor's construction site. At the time of the exchange, Mr. Provenzano did not know the precise reason why the contractor sought the reports. He now understands that the contractor used the reports in order to submit illegally inflated requisitions for wage payments. It is worth noting that Mr. Provenzano did not change any inspection reports and that the reports were not used to circumvent safety standards. Mr. Provenzano has accepted full responsibility for his conduct and agreed to a forfeiture of $30,000, which he has already paid in its entirety.

As part of this submission, we include numerous letters from Mr. Provenzano's family, friends, and others in his community. The letters attest that Michael Provenzano is a good and decent man who has exhibited extreme remorse and shame for his involvement in this offense. Apart from his wrongdoing at HPD, Mr. Provenzano has lived a commendable life as a family man and neighbor, characterized by humility and

compassion for others. Letter after letter describes him as going out of his way to help others without being asked and without ever seeking anything in return. Indeed, the picture of Mr. Provenzano that comes through in these letters is almost impossible to reconcile with the conduct that brings him before the Court for sentencing. We believe that the character of the person revealed through these letters, and the many compelling factors set forth in detail below, support the imposition of a non-Guidelines sentence.[1]

As the Court is aware, it is not bound by the Sentencing Guidelines and is free to impose a non-Guidelines sentence. *See United States v. Booker*, 543 U.S. 220 (2005), *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). As set forth in 18 U.S.C. § 3553(a), courts must impose a sentence "sufficient, but not greater than necessary" to comply with the four purposes of sentencing – retribution, deterrence, incapacitation, and rehabilitation. 18 U.S.C. § 3553(a); *see also United States v. Ministro-Tapia*, 470 F.3d 137, 141 (2d Cir. 2006) (noting that, post-*Booker*, courts should be guided by Section 3553(a) when determining an appropriate sentence). In imposing a reasonable non-Guidelines sentence, the Court must give full consideration to a wide range of sentencing factors under Section 3553(a), including the "history and characteristics of the defendant" and the "nature and circumstances of the offense." *See Crosby*, 397 F.3d at 111-13 (advisory nature of Guidelines gives "renewed significance" to consideration of § 3553(a) factors); 18 U.S.C. § 3553(a).

We respectfully submit that the history and characteristics of Michael Provenzano support a non-Guidelines sentence and that a sentence of probation would achieve a result that is "sufficient, but not greater than necessary" to achieve the goals of § 3553(a).

**Biographical Background**

Michael Provenzano was born on March 30, 1963 in Oceanside, New York and raised nearby in Valley Stream, New York. He had a middle class upbringing - his mother, Carol, worked as a dental assistant and continues in that position to this day, while Mr. Provenzano's late father, Victor, worked as a clerk for Nassau County. While growing up, Mr. Provenzano shared a room in the family's two bedroom apartment with his younger brother Kenneth. Family life for the Provenzanos was stable, as Mr. Provenzano's parents were married until Victor's death in 2005. The Provenzanos were and continue to be tight-knit family. Mr. Provenzano had a close relationship with his father and continues to have a strong relationship with his mother and brother.

---

[1] We do not dispute the Probation Department's determination that before any consideration of the factors enumerated in 18 U.S.C. § 3553(a), the applicable offense level is 17, which carries a sentencing range of 24-30 months imprisonment.

The Provezanos stayed in Valley Stream throughout Mr. Provenzano's youth and his mother still lives there. Mr. Provenzano attended Valley Stream public schools and graduated from Valley Stream High School in 1981. He also attended Sunday School in Valley Stream and regularly attended church with his family. After high school, Mr. Provenzano completed three years of college at SUNY Farmingdale where he studied automotive technology.

In 1989, Mr. Provenzano married his wife, Nancy. They remain happily married and now have two children, Erica, 22, and Michael Jr., 15. Michael Jr. is currently a sophomore in high school, while Erica works in medical insurance billing and continues to reside with her parents. Nancy was not employed until recently, when she started working for a construction company at minimum wage.

Industriousness has always been a part of Mr. Provenzano's makeup, as he has worked for much of his life. His mother describes Mr. Provenzano's work ethic, stating, "[h]e always worked and always resisted asking my husband and me for money. He was proud to do things on his own." Ex. 1 (Letter of Carol Provenzano). As early as grade school, he held a paper route, using the small amounts he would earn to pay for personal items and buy presents for his family. *See id.* While in high school, Mr. Provenzano worked at Toys R Us in the hours after school and on weekends. He also worked his way through the three years he attended college, holding a job at Sterns Department Store. After college, Mr. Provenzano took a job in construction, working as a carpenter and laborer.

In 1990 he accepted a job at HPD as an inspector. Over the next two decades, Mr. Provenzano worked his way up the ladder at HPD, eventually attaining his position as Director of Construction Services. In that position, Mr. Provenzano was charged with overseeing a staff of approximately sixty people including inspectors, supervisors and clerical employees. Mr. Provenzano and his staff monitored HPD construction sites, ensuring that the projects proceeded according to the contract that each construction company held with New York City. After his arrest in June of this year, Mr. Provenzano stopped working at HPD and he formally resigned from his position in September. Since then he has worked in a series of temporary jobs, including as a bartender, in a concessions stand at a golf course, and in a warehouse stripping electrical wire. As of November 19, he has been working for a construction company, helping to rebuild homes damaged in Hurricane Sandy.

**Factors that Justify a Non-Guidelines Sentence**

A. *Mr. Provenzano's History of Commendable Conduct*

The numerous letters submitted on Mr. Provenzano's behalf paint a compelling portrait of a humble, compassionate, and generous man, who is devoted to his family and friends, who values doing the right thing, and who is suffering greatly for his

transgressions. His acceptance of money while employed at HPD is the source of great shame and regret. Still, this conduct does not accurately depict the character of this man. In order to have a true sense of who he is, it is critical that these events be contrasted with the events of the rest of Mr. Provenzano's life. We ask the Court to consider all of the many admirable aspects of Mr. Provenzano's "history and characteristics" in determining an appropriate non-Guidelines sentence.[2]

1. <u>A Compassionate Helping Hand and a Sense of Community</u>

Mr. Provenzano's willingness to provide a helping hand to friends, family and even strangers in need is a common theme that runs through the letters. As his daughter explains, "Whatever the situation was, he had to either help fix it or help make the best of it. Either way people adored him for that. A favorite quote of his on our block is 'That's what neighbors are for.'" Ex. 2 (Letter of Erica Provenzano).

A long-time employer of Mr. Provenzano's mother observes:

> In his community, Michael has always been quick to lend a hand to his neighbors when they were in need of help. He will help with snow removal, grass cutting, or even odd jobs around their house, that they were unable to do for themselves. This is done without fanfare or remuneration, he just likes to help people. He is selfless with his time and skills used to help others.

Ex. 3 (Letter of Steven Kresch).

Nancy Brill and Joseph Carbone, Mr. Provenzano's next-door neighbors for over twenty years, write:

> Michael was an asset to our little block. . . . We remember him shoveling the snow first on our house, and then his own house. . . . Michael was quick to help us whenever

2 We note that although some factors related to a defendant's character and background are not ordinarily considered relevant for sentencing under the Guidelines, a court imposing a non-Guidelines sentence may properly take them into account. In particular, courts have looked to an individual's positive characteristics in imposing non-Guidelines sentences. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . [may] consider for the purpose of imposing an appropriate sentence."); *United States v. Ranum*, 353 F. Supp. 2d 984, 986 (E.D. Wis. 2005) ("[I]n cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guidelines range."); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513 (S.D.N.Y. 2006) ("[I]f ever a man is to receive credit for the good he has done . . . it should be at the moment of his sentencing, when his very future hangs in the balance.").

> help was needed, for example, a leaky faucet or a clogged bathroom sink. When our upstairs toilet cracked and flooded our living room, Michael was the person we turned to for help and advice on how to stop the water flow. He also helped with the hours of clean-up that followed.

Ex. 4 (Letter of Nancy Brill and Joseph Carbone).

Another family-friend describes a similar experience:

> After suffering a great deal of damage to our home when a broken pipe caused a horrific flood, we were at a loss as to how to proceed. Michael traveled an hour from his home to give his expert advice on our situation and assure us it could be fixed. He explained how to begin the process and it was a great relief.

Ex. 5 (Letter of John and Patricia D. Cairney).

Another neighbor writes, "Because my husband Mario and I are elderly, he would offer to shovel the snow in the winter time for us, which was very helpful." Ex. 6 (Letter of Martha Chinnici).

Mr. Provenzano's brother-in-law states:

> I bought my first house in 1997. To say it was a fixer-upper is being kind. Shortly after I bought it, Michael and my family came to visit. . . . Michael came determined to do everything he could to make my house more livable and safe. It was a short visit, but Michael spent the majority of the time inspecting, repairing and doing small projects on the house.

Ex. 7 (Letter of Robert Fleming).

Mr. Provenzano did not limit his helping hands to those who he knew well. A neighbor recalls her first impression of Mr. Provenzano:

> I first met Michael in December of 1997 when I moved to Valley Stream, New York. . . . Michael was the first person to catch my attention, because he asked if my family needed help moving in. I'm sure the movers would have had everything under control, but Michael felt that he

> needed to be a part of the move. His help really made my family and I feel great about the neighborhood.

Ex. 8 (Letter of Valerie Medrano).

Mr. Provenzano's contributions to his friends and neighbors have gone beyond contributing his physical labor. Several letters speak at length about Mr. Provenzano's sensitivity and compassion as coach of his daughter's Little League softball team. One particular story reflects Mr. Provenzano's acute empathy for a young person who was struggling to fit in. As his daughter describes:

> One of my favorite memories I had with my father was when he coached my Little League team. For two years all the girls and I had the best time. Especially this one girl who was so quiet and shy. She always kept to herself and because her parents were going through a divorce her father was never really there to help her play. So immediately my father helped her all he could. Before you knew it, she was so outgoing and loved playing softball because she understood it. My father and I would always stay after practice with her and work with her a little more. By the end of the season she was a different person. The last thing she said to my father when the season ended was 'I will never forget you, thank you for everything!" He had transformed her life for the better.

Ex. 2 (Letter of Erica Provenzano).

Mr. Provenzano's wife Nancy also recalls Michael's help and compassion for this young woman who "didn't have the confidence that her other team members had," as she "was trying to deal with the divorce that her parents were going through." Ex. 9 (Letter of Nancy Provenzano). She writes:

> With Michael's patience and support he was able to build up the girl's confidence and self-esteem and it showed in the way she played ball. I'll never forget how her mother came up to me at the end of the season praising Michael at how well he worked with her daughter and that she was even doing better in school. He touched the hearts of both the mother and daughter in such a short time and even the little girl told me she would never forget him.

*Id.*

Another example of Mr. Provenzano's compassion for others is reflected in an incident recounted by his mother:

> One night during the Christmas season when he was working till midnight he discovered that two of his co-workers had no place to sleep. He insisted that they come home with him, and before I knew it our little apartment was turned into a dorm!

Ex. 1 (Letter of Carol Provenzano).

Mr. Provenzano's community service includes involvement in his church. Mr. Provenzano's brother-in-law describes one of the first times he met Michael:

> One of my earliest memories of Michael was when his family was invited to my parents' house for Thanksgiving. Shortly after dinner, Michael and his Dad slipped out of the house and came back about an hour later. It turns out that they left to go to a local Church and clean up and put away the folding chairs and tables after a Church event—one that they hadn't even attended. At that time in my life, this was puzzling to me. I was young and struggling to work my way through college. Why anyone (let alone my sister's boyfriend who was struggling like me to work his way through school and "make it") would do something like that without directly getting something back in return was beyond me. Thankfully, I made it through college (and law school) and now understand the value of volunteerism and charitable work. It took some time for me to understand this, but ever since I have known him, Michael has been selfless and giving.

Ex. 7 (Letter of Robert Fleming).

Mr. Provenzano has continued to be active in his church. As his mother explains:

> Michael remains active in the church where he grew up. Not only does he attend church, but he helps me in my role as head of the Worship Committee, makes sure the sound system is on for service and off before we leave, greets people at the door and makes them feel welcome, straightens up after church, and serves on the church counting team. When our new pastor and his family were due to arrive this summer he helped get the house ready for

> them, installing hardware and curtains and doing other things to make the place nice for them. People at church know and like him very much.

Ex. 1 (Letter of Carol Provenzano).

Mr. Provenzano's community on the south shore of Long Island was severely impacted by Hurricane Sandy with severe flooding and loss of power for close to two weeks. Despite his initial reticence to go out in public because of the shame of his recent guilty plea, Mr. Provenzano has been a presence in his community, helping neighbors clean up around their homes and using his electrical expertise to help neighbors without power to connect generators to their homes.

Notably, Mr. Provenzano has never sought recognition or anything in return for his good works. As one letter writer states, "I guess the thing that stands out most about this to me is that I never once asked him to do any of these things. He did it on his own and he did so because he wanted to give and help." Ex. 7 (Letter of Robert Fleming). Perhaps his daughter says it best: "He's always putting others before himself, many people would say that is his most famous character trait." Ex. 2 (Letter of Erica Provenzano).

2. Devotion to Family

Throughout his life, Mr. Provenzano has been a devoted family man and is a greatly loved and needed presence. He has been married to his wife, Nancy, for twenty-three years. For much of his marriage, Mr. Provenzano has been the sole breadwinner for his wife and two children. The letters from Mr. Provenzano's wife, mother, children and other members of his family speak affectionately and in volumes on the important role Michael plays in his family. Above all else, being with and providing for his family has been a central focus in his life.

From childhood on, Mr. Provenzano developed strong family ties. His family lived in the same small two bedroom apartment throughout his childhood and adolescence. The close confines brought his family close together and created the model by which Mr. Provenzano continues to live. Mr. Provenzano shared a room with his brother Kenneth and "was and still is a wonderful big brother . . . including him in activities and watching over him." Ex. 1 (Letter of Carol Provenzano). His brother writes that "I have always respected, loved and relied on him for many things. I could probably fill many pages of activities that have influenced me." Ex. 10 (Letter of Kenneth Provenzano).

Mr. Provenzano has always been a dedicated son. His mother describes the comfort and support he gave when his father developed prostate cancer, preceding his eventual death in 2005. During the lengthy period his father was in the hospital, Michael

"never left his [father's] side. He lovingly watched over his father and did whatever he, or I, needed him to do. He was close to his father and mourned his loss very deeply." Ex. 1 (Letter of Carol Provenzano).

Nancy Provenzano states, "No woman could ask for a better husband or father for her children. All my friends tell me how lucky I am to have such a wonderful husband whose only happiness is seeing that his family is happy and healthy." As an example of Michael's dedication to her and their family, Nancy describes how Michael unhesitatingly assumed primary care for their new born daughter after Nancy had difficulties recovering from a cesarean section:

> Michael would take over the late night feedings. He would stay up all hours of the night taking care of the baby and seeing that I was comfortable. And although he had to get up early in the morning to go to work he never once complained about it . . . his main concern was taking care of his family.

Ex. 9 (Letter of Nancy Provenzano). She further describes how Michael has acted as a guiding force in rearing their children. He "raised them to be kind to others and to stand up for those who are mistreated. Many times my children have stuck for other children in school who were being made fun of or bullied, an act of kindness that they were taught from listening to and watching their father in his every day lifestyle." *Id.*

Mr. Provenzano's two children each write about how he has helped them in trying times and more generally over the course of their upbringing. His son describes how Michael is "always supportive about [his] choices and is always caring for [his] well being." Ex. 11 (Letter of Michael Provenzano, Jr.). Michael, Jr. tells several stories about his father being there as he faced the trials and tribulations of childhood. For example, he describes that as a young boy in elementary school he "started getting bullied." Michael, Jr. states, "My father was always on my side. He would complain to the school about me being bullied and would take care of it." *Id.*

Mr. Provenzano's daughter Erica writes of similar feelings and experiences with her father. She states that "I love and admire my father for his many wonderful qualities . . . You could not have a better role model for me and my brother." Ex. 2 (Letter of Erica Provenzano). She describes numerous examples of her father's "unselfish ways." For example, she recalls when she "finally got [her] driver's license." Her father "could not afford to get [her] a car for [her]self." Instead, as she tells it, "he actually gave me his car to use and would walk home from the train station at night so he wouldn't inconvenience me. . . .That's the kind of person my dad is!" *Id.*

Mr. Provenzano's devotion to his wife and children is reflected in other letters submitted to the Court. As his sister-in-law describes, "Michael was the type of dad that

every kid wants, home every night and there for his kids. He doted over his wife and kids. Michael has always provided for his family and taken care of his responsibilities." Ex. 12 (Letter of Judy Fleming). His other sister-in-law sees "him as a man who earnestly loves his family with every fiber of who he is." Ex. 13 (Letter of Pattye Bohnet Fleming). "He is a strong family man. A father of two, and husband for over 20 years, in a solid marriage." Ex. 3 (Letter of Steven Kresch). His brother-in-law describes how Mr. Provenzano's participation in his son's communion and confirmation helped instill in Michael, Jr. "the importance of having and depending on a loving caring God." Ex. 14 (Letter of Chuck Fleming).

After Michael and Nancy were married, they decided to buy a house that they would share with Nancy's parents. While some husbands might find it difficult to live with their in-laws, Mr. Provenzano embraced the arrangement and became very close to his mother-in-law and father-in-law. His mother-in-law describes Michael during the time they lived together as "helpful, kind, considerate and so loving." She states, "I never called Michael my son-in-law or the husband of my daughter, Nancy. He was from the very first our son." Ex. 15 (Letter of Joan Flemm). She also recalls Michael helping her in a time of crisis:

> I was very sick and my husband had broken his leg at the time. Michael came down, called an ambulance and went with me to the hospital. He sat in a chair near my bed for 14 hours, never did he leave my side. He was so very comforting, patient and caring, even though he was so exhausted he would not leave me to go home.

Ex. 15 (Letter of Joan Flemm). Nancy similarly recalls Michael coming to the aid of her mother. She remembers that the next day, after spending a sleepless night with her mother, Michael "went to work with no sleep, and again never complained about it." Ex. 9 (Letter of Nancy Provenzano).

Mr. Provenzano's father-in-law has similar high regard for him: "Mike and I was always there for each other, Mike was always a phone call away. I can't think of anyone I am closer to." Ex. 16 (Letter of Charles Flemm). Mr. Flemm further describes a mundane but telling example of Mr. Provenzano putting the welfare of other family members ahead of his own:

> Mike would leave for work at 5AM, walking two miles to the [train] station, because he didn't want to bother anyone. When the weather was bad, I would tell him to call me when he got up, so I could drive him to the station. But Mike, being Mike[,] he didn't want to bother me. So, I would get up at 4:30AM and wait for him at the bottom of the stairs.

*Id.*

Mr. Provenzano's importance in the lives of his family is best expressed by his two children. As his son writes, "I cannot imagine life without him. . . . I am in high school and I need him now more then ever. Ex. 11 (Letter of Michael Provenzano, Jr.). His daughter writes that "[h]is sentence is really a sentence for all of us, too." Ex. 2 (Letter of Erica Provenzano).

B. *Acceptance of Responsibility and Extreme Remorse*

An additional factor supporting the imposition of a non-Guideline sentence is Mr. Provenzano's early and complete acceptance of responsibility for his actions and his extreme remorse. *See United States v. Fernandez*, 443 F.3d 19, 33 (2d Cir. 2006) (sentencing court may consider remorse as part of the history and characteristics of the defendant when imposing sentence). As noted in the Presentence Investigative Report ("PSR") and in the Government's recommended offense level, the Government was notified in a timely manner of Mr. Provenzano's intention to plead guilty as he pled guilty not long after his arrest. PSR ¶23.

Mr. Provenzano's deep sense of shame and regret is consistently noted by many of his friends and family. His brother-in-law sums up Mr. Provenzano's current state:

> I am not overstating it when I tell you that Michael is devastated by his inexplicable slip and lack of judgment that finds him before your Honor. I have heard from a number of people that it is not uncommon to see Michael quietly sobbing in a corner of the house during the last few months. Michael has expressed his regret to me during almost every conversation we have had lately.

Ex. 7 (Letter of Robert Fleming). Family friends note similar observations:

> We spoke with Michael after his arrest and it was obvious he was upset, embarrassed for his actions and depressed. He no longer was the care-free person we knew and we do not believe he will ever be the same again. We believe he is truly sorry for his actions.

Ex. 4 (Letter of Nancy Brill and Joseph Carbone).

Mr. Provenzano knows that he has let down not only himself, but also many others, including his family and friends. For a man who is so sensitive to the needs of others, and who has given of himself throughout his life, it is painful for Mr. Provenzano

to know that he has been the cause of so much suffering by others. Mr. Provenzano's wife describes his state of mind since his arrest:

> It's killing him what he's putting me and the children through and he deeply regrets ever committing this crime. He knows the consequences he may face in the future but that isn't even a concern for him right now because he's more upset with what we are all going through . . . once again putting everyone else before himself.

Ex. 9 (Letter of Nancy Provenzano).

C. *Mr. Provenzano Has Already Suffered Significant Punishment*

Mr. Provenzano understands that his actions were illegal and wrong and deserving of punishment. Still, it is worth noting that the consequences of Mr. Provenzano's arrest and conviction have and will continue to have a tremendous effect on his life. Most importantly, he knows that he will never be able to return to his job as a city employee and that it will be extremely difficult, if not impossible, to support and care for his family as he could prior to his arrest. As his wife notes, in many ways, "he is already serving his sentence."

Subsequent to his arrest, Mr. Provenzano was forced to resign from the job where he had worked for over 20 years. This has left his family in challenging financial straits, facing a sizeable set of bills and debts. Mr. Provenzano has made every effort to find work. He has taken a bartending class and sought work in that regard. He worked briefly at a concessions stand at a golf course and in a warehouse, stripping copper wire. Recently Mr. Provenzano found a job working for a company overseeing construction on homes damaged during Hurricane Sandy. His sister-in-law describes his current situation:

> As the sole breadwinner for his family, he now faces going to prison and the likely prospect of his family losing their home in foreclosure when the financial responsibilities cannot be met without him. During his pretrial release, Michael has been selflessly working diligently to provide his family with much needed resources during his separation from them. He has taken any job that he has been able to get, including selling cars, working in a warehouse, and bartending.

Ex. 12 (Letter of Judy Fleming). His family is trying to pitch in. After a lengthy search, Nancy Provenzano recently started working at minimum wage, doing clerical work at a construction company, and his daughter has contributed to the household expenses. Still,

as the Pre-Sentence Report notes, the Provenzanos currently have a negative monthly cash flow of over $2000. *See* PSR ¶56. As a result, both Mr. Provenzano and his wife have been forced to terminate and cash in their life insurance policies, and they face the likelihood that they will have to sell their house, which is their primary asset.

In imposing a sentence that is "sufficient, but not greater than necessary" to achieve the goals of sentencing, we urge the Court to consider the substantial impact that Mr. Provenzano's guilty plea already has had on his life and future, and the punishment that he is already suffering. *See United States v. Neiman*, 828 F. Supp. 254, 255 (S.D.N.Y. 1993) ("Where a regime combining effective punishment for purposes of deterrence and supervision for purposes of prevention can further be combined with rehabilitation efforts involving that supervision, the objectives of the statute may be fulfilled; if incarceration would be ineffective for these purposes and counterproductive from the viewpoint of rehabilitation, a departure from the Guidelines is appropriate.").

**Comparative Conduct**

Mr. Provenzano's misconduct came to light during the FBI's investigation of unrelated, serious criminal activity at HPD involving a series of racketeering offenses, including multiple instances of extortion, money laundering, and fraud. As the United States Attorney's office has acknowledged, Mr. Provenzano's conduct is completely unrelated to those offenses, which resulted in a 26 count, multi-defendant RICO indictment. Indeed, apart from the fact that Mr. Provenzano and some of the defendants in the other case once were employed by HPD, there is no connection whatsoever between Mr. Provenzano's actions and those of the defendants charged the other matter. In fact, Mr. Provenzano has never had any contact with many of these other defendants and has not even heard some of their names until they were arrested.

Under these circumstances, the Court should treat Mr. Provenzano separately from the other defendants charged in connection with the unrelated HPD case. Mr. Provenzano's offense was both distinct and far less serious and his sentence should reflect that difference.

**Conclusion**

Michael Provenzano is a good man who made a bad mistake. All of his life, Mr. Provenzano has quietly done good for others, both those near and dear to him and those with whom he has a passing – or even no – acquaintance. His acts of assistance and compassion are not the kind of grand financial contributions that are reported in the press or that result in someone's name being engraved on a plaque or listed in a program for an event. But, as the many letters attest, these sustained actions over many years have made a meaningful difference in people's lives and have contributed to making his community a better place.

Mr. Provenzano has accepted full responsibility for his actions and has made a substantial forfeiture payment. He has never before been involved with the criminal justice system, and, consistent with the shame and remorse he has exhibited to his family and friends, he is resolved never to be again.

We respectfully submit that when Mr. Provenzano's misconduct is weighed against his admirable history and characteristics, the recommended guideline sentence of 24-30 months incarceration is greater than necessary to achieve the goals of § 3553(a), and that a sentence of probation would be sufficient to achieve those goals.

Respectfully submitted,

Matthew E. Fishbein

cc: Assistant U.S. Attorney Christina M. Posa
U.S. Probation Officer James Foster

**Letters Submitted on Behalf of Michael Provenzano**

| | |
|---|---|
| Ex. 1. | Carol Provenzano |
| Ex. 2. | Erica Provenzano |
| Ex. 3. | Steven Kresch |
| Ex. 4. | Nancy Brill and Joseph Carbone |
| Ex. 5. | John and Patricia D. Cairney |
| Ex. 6. | Martha Chinnici |
| Ex. 7. | Robert Fleming |
| Ex. 8. | Valerie Medrano |
| Ex. 9. | Nancy Provenzano |
| Ex. 10. | Kenneth Provenzano |
| Ex. 11. | Michael Provenzano, Jr. |
| Ex. 12. | Judy Fleming |
| Ex. 13. | Pattye Bohnet Fleming |
| Ex. 14. | Chuck Fleming |
| Ex. 15. | Joan Flemm |
| Ex. 16. | Charles Flemm |